NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

JOHN CHEW,                              :
                                         :
                 Petitioner,          :
       v.                               :          CIVIL ACTION NO. 04-5894 (JLL)
                                           :
ROY HENDRICKS, Administrator New        :
Jersey State Prison, and PETER HARVEY,  :
Attorney General of the State of New Jersey,:
                                          :
                 Respondents.         :
_____ :

**LINARES**, District Judge.

Petitioner, John Chew, was convicted of the murder of Theresa Bowman. Petitioner filed the within petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2007) accompanied by a memorandum in support of the petition. Respondents, Roy Hendricks, Administrator of New Jersey State Prison and Peter Harvey, Attorney General of New Jersey, have filed an answer to the petition.[1] Petitioner filed a traverse. The Court has considered all submissions. For the following reasons, the Court denies the petition.

## I.   Factual History

Theresa Bowman was murdered with a knife while in Petitioner's car, which was parked in the Woodbridge Township, New Jersey, Hilton Hotel parking lot.[2] The morning of January

_____

[1] The current Administrator of the New Jersey State Prison is Michelle R. Ricci and the current Attorney General of New Jersey is Anne Milgram.

[2] This Court draws the specific facts of this case from Petitioner's memorandum in support of his petition for writ of habeas corpus, Respondents' answer, and the Supreme Court of

13, 1993, approximately ten hours after her death, police found Ms. Bowman.  She had a piece of paper in her pocket with the name "Joe Martin" and a beeper number written on it.

Police discovered that the car was registered to Petitioner.  They contacted him and set up an interview later that afternoon on January 13, 1993.  Prior to the meeting with Petitioner, Detective Geoffrey Kerwin, the police officer assigned to investigate Ms. Bowman's murder, interviewed Alejandro Mecalco, a chef at the Woodbridge Hotel.  Mr. Mecalco stated that when he was in the parking lot of the Hilton that evening he saw a man that looked like recording artist Kenny Rogers in the car struggling with a woman.  Petitioner did not match the description given by Mr. Mecalco.

When police arrived at Petitioner's home later that afternoon, Petitioner gave a non-custodial statement.  In that statement, Petitioner claimed that he had last seen Ms. Bowman on the evening of January 12, 1993 when she left him at his sister's home.  On January 14, 1993, police requested that Petitioner give a blood sample.  Petitioner provided the sample to police. Reng-Lang Lin, Ph.D., Chief Toxicologist of the State Medical Examiner's Office, found no traces of alcohol or drugs in his blood.  That same day, Detective Kerwin also questioned Petitioner's sister, Ms. Crystal Charette, and her friend, Ms. Helen , at Ms. Charette's home. They gave statements exculpating Petitioner.

Shortly thereafter, Detective Kerwin received several phone calls related to the murder. First, Richard Byrnes, an insurance agent, told Detective Kerwin that Petitioner and Ms. Bowman had taken out a $250,000.00 joint life insurance policy in June 1991.  Furthermore, in

---

New Jersey's opinion in State v. Chew.  844 A.2d 487 (N.J. 2004).  This Court affords the state court's factual determinations the appropriate deference.  See 28 U.S.C. § 2254(e)(1).

December 1992, Petitioner came to Mr. Byrnes's home to pay the monthly premium for the policy in cash. Second, George Tilton, Petitioner's former employee, explained that Petitioner had offered to pay him $10,000.00 to murder Ms. Bowman so that he could collect the proceeds of the insurance policy. Third, Petitioner's son told police that Petitioner had requested that he kill Ms. Bowman and that Petitioner offered him a share of the insurance money in return.

On January 23, 1993, police arrested Petitioner at approximately 9:00 a.m. Before leaving his home, Petitioner asked his mother to call his attorney. That same morning, other police investigators arrived at Petitioner's sister's home. Ms. Charette gave several additional statements contradicting her first statement and incriminating Petitioner. Specifically, she claimed that Petitioner called her to come pick him up at the Woodbridge Hilton the evening of January 12, 1993. According to Ms. Charette, Ms. Borden and she also helped him dispose of his bloodied clothes. Ms. Borden portrayed a similar story in her additional statements.

At 10:53 a.m. of that day, Petitioner made a statement that placed him at the Woodbridge Hilton parking lot the evening of January 12, 1993 and acknowledged that his sister came to pick him up from the lot.[3] Petitioner again asked for his lawyer. At 6:00 p.m., Petitioner requested to speak with Detective Kerwin. Petitioner gave a more detailed statement. He said that he accompanied Ms. Bowman on a drug sale in the Woodbridge Hilton parking lot on January 12, 1993. They planned to sell a kilo of cocaine to a person Ms. Bowman knew named Joe. Petitioner left the car and went into the hotel for approximately forty-five minutes. Upon

---

[3] Petitioner's memorandum in support of petition for writ of habeas corpus notes that Petitioner's first statement was at 10:53 p.m. A review of the Supreme Court of New Jersey's decision in State v. Chew, 695 A.2d 1301, 1308 (N.J. 1997) shows that the statement was taken at 10:53 a.m.

returning, Ms. Bowman told him that she had been ripped off.  Petitioner explained that they

began to fight.  Ms. Bowman hit Petitioner and scratched his face.  She also told him that she had

sexual encounters with a man named Randy and that she was going to "move in" with him.

(Petitioner's Appendix ("PA") at pp. 104-05).  Petitioner said that he "went off."  (PA at p. 88).

He did not remember getting the knife or stabbing Ms. Bowman.  (PA at p. 105).  Petitioner

further stated that he had asked his sister to pick him up at the Woodbridge Hilton after the deal.

## II.   <u>Procedural History</u>

On March 24, 1993, a Middlesex County Grand Jury indicted Petitioner on five counts

relating to the events of January 12, 1993.  The prosecutor's office also served Petitioner with

notice of one aggravating factor, that the killing was done in the expectation of some pecuniary

gain.  Petitioner moved to dismiss the aggravating factor but the trial court denied the motion.

The aggravating factor elevated the crime to a capital offense.  Petitioner initially hired Terrance

Toner, Esq., as his defense attorney.  The Office of the Public Defender also assigned Pamela

Brause, Esq., to the case in January 1994.

Prior to trial, Petitioner moved to exclude his statements made to detectives on the day of

his arrest.  The trial court held a <u>Miranda</u> hearing.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

On April 10, 1995, the court granted the motion to suppress his first custodial statement made at

10:53 a.m. on January 23, 1993; but denied the motion to suppress his 6:00 p.m. custodial

statement.

From approximately May 22, 1995 through June 13, 1995 the Superior Court of New

Jersey, Law Division, Middlesex County conducted the guilt phase of the trial.  Both Mr. Toner

and Ms. Brause explained their trial strategy in a state court post-conviction relief hearing in June

2000.  Mr. Toner explained that Petitioner initially said that he was taking medication when he gave his January 23, 1993 custodial statements to police.  Mr.Toner considered questioning the admissibility of those statements because of the medication.  He hired Dr. Robert J. Pandina to support this defense.  Two months later, Mr. Toner received Dr. Lin's report, which found no traces of drugs or alcohol in Petitioner's blood sample.  When Mr. Toner gave Dr. Pandina the report, Dr. Pandina stated that he could not testify at trial on Petitioner's behalf because Dr. Lin's report contradicted Petitioner's statements regarding his use of medication.  Instead, Mr. Toner decided to use Dr. Lin's report to attack the credibility of Ms. Charette and Ms. Borden who had stated that they smoked marijuana with Petitioner on January 12, 1993.

Mr. Toner also planned on using the beeper number found in Ms. Bowman's pocket in the defense.  He had called the number and found that it had been disconnected.  The police report indicated that Detective Kerwin had mistakenly called a different number than the one that police found in Ms. Bowman's pocket.  Mr. Toner thought that he could challenge the thoroughness of the police investigation based on the incorrect beeper number.

Petitioner's trial counsel decided to employ a denial defense as opposed to a passion/provocation defense.  They based their argument on Dr. Lin's report, which discredited the testimony of Ms. Charette and Ms. Borden; Detective Kerwin's apparent mistake in calling the wrong beeper number; and the eye-witness testimony of Woodbridge Hilton Chef, Mr. Mecalco.

Shortly before the trial began, the prosecution informed Mr. Toner that Dr. Lin's report could only trace drug and alcohol usage occurring within 24-hours of the time that the blood sample was taken.  Therefore, the test could not determine whether Petitioner had smoked marijuana on January 12, 1993 because police took the sample on January 14, 1993.  Mr. Toner

acknowledged that he did not question Dr. Lin regarding his report nor did he remember having Petitioner's blood sample tested by another doctor.  The new information eliminated Petitioner's attorneys' opportunity to challenge the credibility of Ms. Charette and Ms. Borden.

Additionally, after jury selection, Mr. Toner learned that the police had indeed checked the correct beeper number after calling the incorrect number and had also discovered that it had been disconnected.  Mr. Toner acknowledged that he had not followed up on the initial report to see if the police had made a mistake.  Mr. Toner admitted at trial that this new information damaged his argument criticizing the police investigation.

Petitioner's counsel requested that the trial be postponed based on these new findings, but their request was denied.  At trial, the denial defense centered around Mr. Mecalco's testimony.  Mr. Mecalco identified a man in the car with Ms. Bowman the night of the murder who resembled recording artist Kenny Rogers.  Petitioner did not match this description.

As part of its case, the prosecution offered as evidence Ms. Charette's and Ms. Borden's prior consistent statements to bolster the women's credibility.  The trial court admitted the statements.  Additionally, the prosecution called the Middlesex County Medical Examiner to give testimony regarding the injuries that Ms. Bowman incurred the evening of the murder.  The examiner stated that the wounds on Ms. Bowman's face were made intentionally while the victim was immobile.

A jury found Petitioner guilty of purposeful or knowing murder by his own conduct (count one) and possession of a weapon for an unlawful purpose (count two).  The trial court granted Petitioner's motions to dismiss count three, charging Petitioner with making a terroristic threat and counts four, and five, charging Petitioner with attempted conspiracy to commit murder.

The penalty phase of the trial ran from June 19, 1995 to June 22, 1995.  The jury unanimously found Petitioner guilty of the sole aggravating factor.  The jury also found several mitigating factors.  Balancing the aggravating factors against the mitigating factors, the jury unanimously found that the aggravating factor outweighed the mitigating factors.  The jury returned a death penalty verdict, and the court sentenced Petitioner to death.[4]

Petitioner sought exhaustive review of his conviction.  Pursuant to New Jersey Court Rule 2:2-1(a)(3), Petitioner filed a direct appeal with the Supreme Court of New Jersey, which subsequently affirmed Petitioner's conviction and death sentence in an opinion on June 26, 1997. Chew, 695 A.2d at 1306.  The Court preserved his request for a proportionality review.  Id.  The Supreme Court of New Jersey heard Petitioner's proportionality appeal and, on June 3, 1999, found his sentence proportionate.  State v. Chew, 731 A.2d 1070 (N.J. 1999).  The Court denied Petitioner's motion for reconsideration of the proportionality ruling.  Petitioner then filed a petition for certiorari in the United States Supreme Court, which was denied on December 6, 1999.  Chew v. New Jersey, 528 U.S. 1052 (1999).

Thereafter Petitioner filed an application for post-conviction relief in the trial court.[5]  On May 22, 2002, the trial court denied the petition for post-conviction relief in a written opinion. (PA at p. 52-58).  Petitioner appealed the decision directly to the Supreme Court of New Jersey as of right.  R. 2:2-1(a)(3).  On March 25, 2004, the Supreme Court affirmed his conviction, but

---

[4] The trial court merged the conviction for possession of a weapon for unlawful purpose with the murder conviction.

[5] A petition for post-conviction relief in New Jersey is the state's analogue to a federal petition for a writ of habeas corpus.  See, e.g., State v. Preciose, 609 A.2d 1280, 1284 (N.J. 1992).

vacated his death sentence, and remanded the case for a new penalty phase.  State v. Chew, 844 A.2d 487 (N.J. 2004).  On June 10, 2004, the trial court re-sentenced Petitioner to life imprisonment with thirty years before parole eligibility for the murder.[6]  Additionally, on that day, Petitioner plead guilty to a separate charge of unlawful possession of a weapon and received a separate sentence of eighteen months in prison with nine months before parole eligibility.  The instant petition followed.

## III.    Legal Discussion

Pursuant to 28 U.S.C. § 2254(a), a district court shall consider an application for habeas relief filed by a person "in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  See Lackawanna County District Attorney v. Coss, 532 U.S. 394 (2001).  Petitioner asserts that his rights pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution were violated.  Specifically, Petitioner claims that:

(1)    Petitioner's trial counsel rendered ineffective assistance of counsel by conducting an inadequate investigation which led to the use of a denial defense rather than a passion/provocation defense;

(2)    the trial court improperly admitted into evidence the prior consistent statements of Crystal Charette and Helen Borden as substantive evidence;

(3)    the trial court improperly admitted into evidence Petitioner's second statement to police, made at 6:00 p.m., on January 23, 1993;

(4)    the prosecutor committed prosecutorial misconduct during closing arguments when he gave his personal "impressions" of two witnesses' testimony, stated what evidence "suggested" to him, and spoke of facts that were not part of evidence at trial; and

---

[6] Petitioner's conviction for possession of a weapon for an unlawful purpose was again merged with the murder conviction.

(5)     the trial court erred in permitting the State's medical examiner to testify regarding the marks on the victim's body because Petitioner did not have prior knowledge that the medical examiner would discuss the specific wounds on Ms. Bowman's body in his testimony.

Respondents claim that Petitioner's application for habeas relief is without merit.  Section 2254(d) sets forth the standard for granting or denying a writ of habeas corpus.  The statute reads as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court discussed the application of section 2254(d)(1) in Williams v. Taylor, 529 U.S. 362 (2000).  In Williams, the Court analyzed subsection one as two clauses:  the "contrary to" clause and the "unreasonable application" clause.  See Williams, 529 U.S. at 405-08; see also Fischetti v. Johnson, 384 F.3d 140, 147-48 (3d. Cir. 2001) (analyzing the requirements of section 2254(d)(1)).  The Court held that state court decisions are "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  Williams, 529 U.S. at 405-06; Fischetti, 384 F.3d at 147-48.  With respect to the

9

"unreasonable application" clause, the Court held that a federal court may "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of the applicant's case.  Williams, 529 U.S. at 413.  The state court's application of clearly established federal law must be objectively unreasonable.  Id. at 409; Fischetti, 384 F.3d at 148.

In determining whether to grant habeas relief under section 2254(d)(2), a federal court must apply a presumption of correctness to factual determinations made by the state court, which may only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001).  Federal habeas courts ordinarily refrain from revisiting credibility determinations made by state courts.  See Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001).

Before discussing the merits of the instant petition, the Court considers whether the petition is barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1).

## A.    Statute of Limitations

Respondents argue that the instant petition is untimely pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended federal habeas corpus law to state, in pertinent part, that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).[7]  The law further reads that "[t]he limitation period shall run from . . . the date on

---

[7] Respondents mistakenly cite 28 U.S.C. § 2254(d) instead of section 2244(d) as the statutory provision which denotes a one-year statute of limitations on the filing of federal habeas corpus petitions.  Respondents and Petitioner agree that section 2244(d)(1)(A) is the only

which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . ." 28 U.S.C. § 2244(d)(1)(A).

The Court does not consider Respondents' arguments, and instead, construes the instant petition as timely and reaches the merits, in light of the United States Supreme Court's recent decision in Burton v. Stewart, 127 S. Ct. 793 (2007). In Burton, the Court interpreted section 2244(d)(1)(A) as follows:

> "Final judgment in a criminal case means sentence. The sentence is the judgment." Accordingly, Burton's limitations period did not begin until both his conviction *and* sentence "became final by the conclusion of direct review or the expiration of the time for seeking such review"—which occurred well *after* Burton filed his 1998 petition.

Burton, 127 S. Ct. at 798-99 (internal citations omitted). Thus, the Burton case indicates that the one-year statute of limitations under the AEDPA does not even begin to run until both the *conviction and sentence* become final.[8]

The Eleventh Circuit recently applied Burton in Ferreira v. Secy, Dep't of Corrections, —F.3d—, 2007 WL 2239265 (11th Cir. Aug. 7, 2007). In Ferreira, the petitioner was convicted in

---

applicable section of 2244(d)(1) that is relevant for this petition.

[8] The issue in Burton was whether the petitioner's habeas petition should be dismissed as an unauthorized successive petition pursuant to 28 U.S.C. § 2244(b). Burton v. Stewart, 127 S. Ct. 793, 794 (2007). The Burton Court found that the petition was a successive petition because the petitioner was contesting the same custody imposed by the same state court judgment as he previously contested in a petition filed several years before. See id. at 798. The Burton Court addressed the AEDPA limitations period in response to the petitioner's argument that if he had waited to file his first habeas petition until state court review of his sentencing claims was complete, he risked losing the opportunity to challenge his conviction in federal court pursuant to the one-year statute of limitations. See id. at 798-99. The Court rejected the petitioner's argument on the grounds that the one-year statute of limitations did not begin to run until both petitioner's conviction and sentence became final. Id.

state court of first-degree murder and armed robbery. This conviction became final on December 10, 1997—ninety days after the Florida Supreme Court denied his appeal since petitioner did not file a certiorari petition in the United States Supreme Court. See Ferreira, —F.3d—, 2007 WL 2239265, at *1. The petitioner subsequently filed a motion for post-conviction relief, requesting a re-sentence, which the trial court granted. Id. The petitioner was re-sentenced on April 14, 2003. Id. The petitioner filed his habeas petition on June 10, 2003 challenging solely his underlying conviction, not the subsequent re-sentence. Id. The court held that, pursuant to Burton, the statute of limitations under section 2244(d)(1) began to run on April 14, 2003, the date that the trial court re-sentenced the petitioner during post-conviction proceedings, not on December 10, 1997, even though the petitioner was solely challenging the underlying conviction. Id. at *7. In so holding, the court seized upon the Burton Court's language above, indicating that both the judgment of conviction and sentencing judgment, *together*, form the judgment that imprisons the petitioner. See id. Thus, the petition was timely because it was filed within one-year of the judgment which imprisoned the petitioner, namely, the April 14, 2003 judgment. Id.

Accordingly, considering the foregoing, and absent directives from the Third Circuit to the contrary, the Court will construe the instant petition as timely. Although Petitioner's conviction became final on December 6, 1999, due to his re-sentencing, his sentence did not become final until June 10, 2004. Therefore, the statute of limitations starts to run from June 10, 2004. The instant petition was filed on November 30, 2004, well within the one-year statute of limitations period. Thus, the Court will reach the merits below.

**C.    Merits of the Petition**

**1.    Ineffective Assistance of Counsel**

In his first claim for habeas relief, Petitioner argues that trial counsel was ineffective for conducting an inadequate investigation of the issues surrounding Dr. Lin's drug test and the police report indicating that the detective had called the incorrect beeper number.  The United States Supreme Court announced the standard that governs claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  The legal principle established in Strickland has two parts.  Id. at 687.  Petitioner must show (1) that counsel's performance was "deficient"; and (2) that counsel's deficient performance prejudiced the defendant.  Id.  The performance inquiry under Strickland focuses on whether "counsel's assistance was reasonable considering all circumstances." Id. at 688.  Petitioner must overcome a strong presumption that counsel's representation was reasonable.  Id. at 689.  To establish prejudice, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Supreme Court of New Jersey considered this claim on March 25, 2004.  Chew, 844 A.2d at 498.  The court noted that counsel's investigation into Dr. Lin's report and the beeper number was "inadequate."  Id. at 501.  In particular, counsel's failure to further investigate Dr. Lin's report of Petitioner's drug test was imprudent considering counsel's reliance on the report at trial in support of their denial defense.  Id.  However, the court held that counsel's "decision to pursue a denial defense did not constitute deficient performance because it was reasonable in light of the eye-witness's account." Id. at 501-02.  The court found that Dr. Lin's report and the beeper number were

13

"minor collateral issues" that were not the determining factors in counsel's decision to pursue a denial defense.  Id. at 501.  Furthermore, with regard to whether counsel's performance prejudiced the defense, the Supreme Court held that "defense counsel had to choose between two weak defenses, and selected the denial defense over passion/provocation while still seeking and receiving a lesser-included charge on passionation."  Id. at 502.  The Supreme Court would "not second-guess counsels' trial strategy in that regard."  Id.

Petitioner asserts two independent grounds for granting his writ of habeas corpus.  Petitioner claims that the Supreme Court of New Jersey's decision was (1) an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2); and (2) was an unreasonable application of Strickland.  28 U.S.C. § 2254(d)(1).  With regard to the first contention, Petitioner claims that the Supreme Court of New Jersey was unreasonable in determining that Dr. Lin's drug test and the police report on the beeper number were "minor collateral issues" and that the eye-witness account was central to the selection of denial defense.  Chew, 844 A.2d at 501.  Petitioner supports this proposition by citing from the trial record during the guilt phase.  Specifically, Petitioner notes counsel's attempt to have the trial adjourned after learning they had mistakenly relied on Dr. Lin's test and the police investigation of the beeper number in light of the information that they received immediately prior to trial.  Petitioner asserts that counsel would not have sought an adjournment if the drug test and the questions surrounding the police report were not central to their decision to use a denial defense.  Petitioner concludes that the Supreme Court of New Jersey's determination to the contrary was erroneous.

Petitioner's assertion that 2254(d)(2) provides an independent grounds for granting the habeas petition is without merit.  As previously stated, a federal court is required to give a presumption of

14

correctness to a state court's factual determinations. See 28 U.S.C. § 2254(e)(1). Petitioner has not shown that the Supreme Court of New Jersey was unreasonable in its ruling and, accordingly, Petitioner does not meet his burden to have the Court grant him habeas relief pursuant to section 2254(d)(2).

Petitioner also contends that the Supreme Court of New Jersey's opinion unreasonably applies Strickland in that:  (1) counsel's performance was deficient in not thoroughly investigating Dr. Lin's test and the beeper number; and (2) the deficiency prejudiced the defense.  Petitioner relies on the testimony of Mr. Toner and Ms. Brause in the post-conviction relief hearing to support his argument criticizing counsel's performance as deficient.[9]  Then, Petitioner argues that counsel's inadequate investigation led to the selection of a denial defense instead of a passion/provocation defense.  Petitioner claims that the passion/provocation defense was consistent with his statement to police placing him at the crime scene and with the testimony of Ms. Charette and Ms. Borden.  Given the benefits of the passion/provocation defense, Petitioner argues that there was a reasonable probability that defense would have led to a different outcome than a denial defense.[10]

_____

[9] Specifically, Petitioner notes that Mr. Toner admitted that he had merely relied on the initial police report, which showed that Detective Kerwin had called the wrong beeper number, rather than investigating that fact for himself, and Ms. Brause acknowledged that the attorneys had "under-investigated" Dr. Lin's report.

[10] Petitioner also states that counsel's deficient performance at trial, i.e. counsel's choice of a denial strategy, prejudiced him in the penalty phase because:  (1) it was inconsistent with the humanizing strategy used in the penalty phase; and (2) the use of the passion/provocation defense would have eliminated the possible use of the aggravating factor.  This Court rejects these arguments.  The Supreme Court of New Jersey explained in its opinion that a passion/provocation defense at the guilt phase would also have had negative consequences at the penalty phase.  Chew, 844 A.2d at 502 ("defense ran the risk of the jury rejecting defendant's explanation at both the guilt and penalty phases in light of the evidence of premeditation and financial gain").  Also, the use of the passion/provocation defense would not have eliminated the prosecution's use of the aggravating factor.  Presumably, the State would have charged Petitioner

This Court finds that the Supreme Court of New Jersey did not unreasonably apply <u>Strickland</u>. The United States Supreme Court explained in <u>Strickland</u> that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 690-91.  This Court agrees that counsel's investigation was somewhat "deficient." <u>Chew</u>, 844 A.2d at 501.  However, "in light of all circumstances," counsel's actions were not "outside [the] wide range of professional competent assistance."  <u>Strickland</u>, 466 U.S. at 690. Counsel's defense centered around Mr. Mecalco's eye-witness testimony, which placed a man who did not resemble Petitioner in the car with Ms. Bowman before her murder.  Additionally, counsel argued that Petitioner was coerced into giving the 6:00 p.m. statement at the police station on January 23, 1999, which equated to a confession, because police refused to give Petitioner his medication. Under the circumstances, counsel's failure to investigate the report and the beeper number, and ultimate decision to pursue a denial defense was not unreasonable.

This Court also agrees with the Supreme Court of New Jersey's holding that counsel's failure to investigate did not prejudice the defense such that the outcome of the case would have been different if not for counsel's error.  As the United States Supreme Court stated in <u>Strickland</u>, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside judgment." <u>Id.</u> at 691 (citing <u>United v. Morrison</u>, 449 U.S. 361, 364-65 (1981)).  Petitioner did not meet his burden in showing that a passion/provocation defense would have resulted in a different outcome.  Although

---

with the aggravating factor regardless of the defense strategy chosen.  If the jury ruled in favor of the State, then the use of the aggravating factor would still be possible.

flaws in a denial defense were evident, a passion/provocation defense was equally faulty.  The Supreme Court of New Jersey listed the evidence that rebutted a passion/provocation defense in its opinion:  "Defendant's son, Robert, testified that defendant told him about the life insurance policy and his plan to kill Bowman for the proceeds, . . . defendant took out a joint policy to deflect suspicion that he purchased the insurance with murder in mind, and . . . defendant repeatedly offered [Tilton] $10,000 to kill Bowman."  Chew, 844 A.2d at 502.  Moreover, at the guilt phase, the jury was instructed on passion/provocation manslaughter and therefore had an opportunity to rule on the matter.  Given such evidence, a passion/provocation defense did not guarantee a more favorable outcome to Petitioner.

Thus, based on the foregoing, the Court finds that Petitioner has not shown that the Supreme Court of New Jersey's findings on Petitioner's ineffective assistance of counsel claim were contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or involved an unreasonable determination of facts in light of the evidence presented.  Accordingly, Petitioner's claims for habeas relief based on ineffective assistance of counsel are denied.

**2.      Admittance of Prior Consistent Statements**

Petitioner claims that the Supreme Court of New Jersey's ruling that the trial court properly admitted the prior consistent statements of Ms. Charette and Ms. Borden was contrary to clearly established federal law.  28 U.S.C. 2254(d)(1).  Both Ms. Charette and Ms. Borden had given statements on January 23, 1999, which ultimately were consistent with their testimony at trial.  The prosecution sought to admit the statements after the women's credibility came into question on cross-

examination.  Chew, 695 A.2d at 1325. The Supreme Court of New Jersey ruled that the women's

statements fell under an exception to the hearsay rule pursuant to N.J. R. Evid. 803(a)(2).  Id. at 1326.

N.J. R. Evid. 803(a)(2) states, in pertinent part, that a statement is not excluded by the hearsay

rule if it was "previously made by a person who is a witness at a trial or hearing, provided it would

have been admissible if made by the declarant while testifying and the statement" was "consistent

with the witness' testimony and is offered to rebut an express or implied charge against the witness

of recent fabrication or improper influence or motive . . . ."  The New Jersey rule is modeled after

Federal Rule of Evidence 801(d)(1)(B).[11]  In Tome v. United States, the United States Supreme Court

held that Federal Rule of Evidence 801(d)(1)(B), "permits the introduction of a declarant's consistent

out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only

when those statements were made before the charged recent fabrication or improper influence or

motive."  513 U.S. 150, 165 (1995).  Thus, the Tome case sets forth a temporal requirement for

admitting prior consistent statements.

The Supreme Court of New Jersey acknowledged that N.J. R. Evid. 803(a)(2) mirrored the

federal rule, however, the court stated that it "need not resolve whether N.J. R. Evid. 803(a)(2)

contain[ed] the temporal requirement of the federal rule" established in Tome.  Chew, 695 A.2d at

1326-28.  The court stated that it was not clear when the women's motive to fabricate their stories

_____

[11] Rule 801(d)(1)(B) provides that:

[a] statement is not hearsay if – . . . [t]he declarant testifies at trial . . . and is subject
to cross-examination concerning the statement, and the statement is . . . (B)
consistent with the declarant's testimony and is offered to rebut an express or implied
charge against the declarant of recent fabrication or improper influence or motive .
. . .

18

arose; however, the court noted that police informed both women that they faced potential murder and obstruction charges prior to their giving statements on January 23, 1993, which would indicate that the motive to lie existed before the statements were given.  Id. at 1326-27.  Yet, at trial the prosecution directly questioned the women's credibility.  Id. at 1327.  The court found that the New Jersey rule permitted a limited use of prior consistent statements for use in *rehabilitating* witnesses after their credibility was impeached during cross-examination.  Id. (emphasis added).  Moreover, "[t]he prior consistent statements had significant 'probative force bearing on credibility beyond merely showing repetition.'"  Id. at 1328 (quoting United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986)).  In concluding, the court determined that "the differing motives to fabricate and the rehabilitative use of the evidence" were sufficient reasons to admit the prior statements.  Id.

Petitioner asserts that the Supreme Court of New Jersey's ruling on direct appeal in Chew, 695 A.2d at 1328, that the trial court did not err when it admitted the prior consistent statements, was contrary to the United States Supreme Court's decision in Tome.  See 28 U.S.C. § 2254(d)(1). Consistent with the reasoning in Tome, Petitioner argues that Ms. Charette's and Ms. Borden's prior statements were inadmissible at trial because both women had reason to fabricate their stories when they gave statements inculpating Petitioner on January 23, 1993.  According to Petitioner, the trial court should have followed the United States Supreme Court's ruling in Tome in interpreting the New Jersey Rule of Evidence.

Respondents argue that Petitioner's claim is improper because the Supreme Court of New Jersey's ruling on the admission of Ms. Charette's and Ms. Borden's prior consistent statements did not violate the "Constitution, laws, or treaties of the United States."  28 U.S.C. § 2254(a); See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (stating that a federal habeas court does not reexamine state

court rulings on questions of state law).   Respondents' position has merit.  In <u>Tome</u>, the Supreme Court did not find that the admission of prior consistent statements was unconstitutional.  Instead, <u>Tome</u> construed a Federal Rule of Evidence and made a determination as to the admissibility of that evidence.   States may interpret their own rules of evidence as they see fit even if the state rule is a counterpart to the federal rule.  <u>See</u> <u>Machin v. Wainwright</u>, 758 F.2d 1431, 1433 (11th Cir. 1985) (noting that in a habeas proceeding federal courts must defer to a state court's interpretation of its own evidentiary rules).  Thus, this is not a proper habeas claim.

However, even if this Court were to consider Petitioner's argument on the merits, the potential error was harmless.  The United States Supreme Court has explained that an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  The decision to admit Ms. Charette's and Ms. Borden's prior consistent statements did not have a "substantial and injurious effect" on the jury's verdict.  As the Supreme Court of New Jersey stated in its opinion, Petitioner's defense team questioned the women's credibility and argued forcefully that the women changed their stories to avoid charges and potential jailing.  <u>Chew</u>, 695 A.2d at 1328.  The jury had an opportunity to hear the women's testimony and decide whether they were credible.   Accordingly, the admission of Ms. Charette's and Ms. Borden's prior consistent statements did not violate Petitioner's due process rights.

**3.     Admittance of Petitioner's Statement**

In Petitioner's third claim for habeas relief, he argues that the Supreme Court of New Jersey's adjudication of his claim, which accepted the trial court's findings regarding his 6:00 p.m. custodial

statement, was an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). In its decision, the Supreme Court of New Jersey acknowledged that Petitioner invoked his right to counsel at 12:50 p.m. on January 23, 1993. Chew, 695 A.2d at 1318. Then, at approximately 6:00 p.m., Petitioner gave the statement contested in the instant case to police. Id. The Supreme Court of New Jersey held that said statement was properly admitted. Id. at 1321. Specifically, the court found that Petitioner initiated the conversation with police and that Petitioner made a "knowing, intelligent, and voluntary waiver [of his right to counsel] beyond a reasonable doubt." Id. at 1318-19.

In Miranda v. Arizona, the United States Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against self-incrimination included the right to have all interrogation cease when defendant requests counsel. 384 U.S. at 474. In Edwards v. Arizona, 451 U.S. 477 (1981), and subsequently in Oregon v. Bradshaw, 462 U.S. 1039 (1983), the Supreme Court set forth a two-step process to determine if a defendant has waived his right to counsel. First, the police cannot re-commence interrogation after the defendant has requested counsel unless the defendant "initiates further communication, exchanges, or conversations with the police." Bradshaw, 462 U.S. at 1044 (quoting Edwards, 451 U.S. at 485). Second, the defendant's waiver of his right to counsel must be "knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Id. at 1046 (quoting Edwards, 451 U.S. at 486 n. 9).

The Supreme Court of New Jersey first considered whether Petitioner initiated conversation with the police before his 6:00 p.m. statement. Chew, 695 A.2d at 1318. When analyzing this issue, the Supreme Court set forth the test used by the majority in Bradshaw. Id. The Bradshaw court stated that "evinc[ing] a willingness and a desire for a . . . discussion about the investigation . . . . [or that]

21

could reasonably have been interpreted by the officer as relating generally to the investigation" constitutes initiation. Bradshaw, 462 U.S. at 1045-46. Petitioner argued that the court should apply the initiation standard set forth in Justice Marshall's dissent in Bradshaw. Chew, 695 A.2d at 1318. Justice Marshall found that a defendant initiates conversation with police when he inquires about the "subject matter of the investigation." Bradshaw, 462 U.S. at 1054 (Marshall, J., dissenting). The court recognized that these are separate tests, but perceived "little difference" between them. Chew, 695 A.2d at 1318. The court then applied Justice Marshall's initiation standard, which is more favorable to a criminal defendant. Id. Under that formulation of the test, the court found that Petitioner initiated conversation with police. Id. First, Petitioner requested to speak with Detective Kerwin and proceeded to question the detective as to what he was "facing". Id. Then, when Petitioner stated that he "went off" on Ms. Bowman, Detective Kerwin asked Petitioner to stop in order to get a tape recorder and another officer. Id. Additionally, the detective re-read Petitioner his Miranda rights before taping Petitioner's final statement. Id.

The Supreme Court of New Jersey then explained how Petitioner knowingly, intelligently, and voluntarily waived his right to counsel. Id. at 1319. The court noted that Petitioner had been arrested over twenty times and therefore was familiar with the criminal justice system. Id. Additionally, police had already read Petitioner his Miranda rights earlier that day. Id. When Petitioner requested to speak with his attorney, all questioning from police ceased. Detective Kerwin also re-read Petitioner his Miranda warnings immediately prior to Petitioner's final statement. Id.

Petitioner claims that he did not initiate the conversation with police which led to his final

statement nor did he knowingly and intelligently waive his right to counsel.[12]  He argues that the Supreme Court of New Jersey's adjudication of his claim was an unreasonable determination of the facts given the United States Supreme Court's ruling in Bradshaw.  28 U.S.C. 2254(d)(2).

This Court finds that the Supreme Court of New Jersey was not unreasonable in determining that Petitioner had initiated the conversation with Detective Kerwin before issuing his final statement at 6:00 p.m.  Petitioner's argument misapplies Bradshaw.  The Supreme Court of New Jersey chose to follow the more defendant-friendly dissenting opinion in Bradshaw and yet, the Court still found in favor of the State.  Chew, 695 A.2d at 1318.  In the instant case, after Petitioner asked Detective Kerwin what he was "facing," Petitioner continued to discuss the events surrounding the evening of Ms. Bowman's death without any prodding or influence from police.  Id.  Clearly, Petitioner initiated the exchange with police.

Petitioner's assertion that he did not knowingly, intelligently, and voluntarily waive his right to counsel is also unfounded.  The United States Supreme Court has held that a court must make the determination as to whether a person knowing and intelligently waived his right to counsel by looking at the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused."  Bradshaw, 462 U.S. at 1046 (quoting North Carolina v. Butler, 441 U.S. 369, 374-75 (1979)).  The Supreme Court of New Jersey evaluated each of those criteria and came to the determination that Petitioner had waived his right.  Chew, 695 A.2d at 1319.  Most notably, Detective Kerwin re-administered the Miranda warnings immediately before Petitioner gave his final

---

[12] In Petitioner's memorandum in support of his petition for habeas corpus relief, Petitioner does not detail his argument regarding which party initiated the conversation.  Rather, Petitioner asks this Court to refer to Petitioner's legal argument contained in his direct appeal to the Supreme Court of New Jersey.

statement.  Id.  This Court finds that Petitioner "understood his right to counsel and intelligently and knowingly relinquished it."  Edwards, 451 U.S. at 484.  Therefore, Petitioner's claim is without merit.[13]

### 4.      Prosecutorial Misconduct

Petitioner claims that the prosecutor violated his due process rights during closing argument by giving opinions on the importance of evidence presented at trial and on the credibility of witnesses. The Supreme Court of New Jersey found that the prosecutor's conduct did not deprive Petitioner of a fair trial.  Chew, 695 A.2d at 1329.  Given the " 'considerable leeway' " that prosecutors have in closing arguments, the court determined that "the prosecutor's comments were sufficiently related to the scope of the evidence before the jury."  Id. at 1329-30 (quoting State v. Purnell, 601 A.2d 175, 185 (N.J. 1992)).  Additionally, the Supreme Court of New Jersey noted that "the trial court gave prompt curative instructions" to ensure that jurors knew what facts they could consider.  Id. at 1330.

When a prosecutor's closing remarks are challenged in a habeas petition, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "  Darden v. Wainwright, 477 U.S. 168, 181 (1986)

---

[13] As an independent ground for relief, Petitioner also contends that the Supreme Court of New Jersey erred in finding that Petitioner's final statement to police on January 23, 1993 was not the fruit of the illegally obtained prior statement.  This Court has reviewed the Supreme Court of New Jersey's decision in this regard and finds no basis upon which to conclude that such decision was erroneous.  The Supreme Court of New Jersey concurred with the trial court that a substantial period of time passed between Petitioner's 10:53 a.m. statement and his 6:00 p.m. statement; the second statement was a marked departure in substance that the first statement; and Petitioner initiated his 6:00 p.m. statement to police.  Further, the Court found that various other intervening circumstances indicated that the second statement was not the fruit of the illegally obtained first statement.  Accordingly, this Court finds that the Supreme Court of New Jersey's findings in this regard were not only reasonable, but were appropriate and thorough.

24

(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  In analyzing whether a due process violation occurred, the court must examine the prosecutor's comments "in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner claims that the Supreme Court of New Jersey's ruling was an unreasonable application of Berger v. United States, 295 U.S. 78 (1935).  In Berger, the United States Supreme Court determined that a prosecutor's actions amounted to prosecutorial misconduct when he put "words into the mouths" of witnesses, assumed prejudicial facts that were not evidential and pretended to hear things that witnesses had not actually heard.  Berger, 295 U.S. at 84.

This Court finds that the prosecutor's comments in the instant case did not "so infect the trial with unfairness" nor did his actions equate to those of the prosecutor in Berger such that Petitioner was denied his due process rights.  During his closing argument, the prosecution did give his personal "impression" of witness credibility.  Trial Transcript at 63, 66, State v. Chew, No. 507-03-93 (N.J. Super. Ct. Law Div. June 12, 1995).  Nevertheless, as the Supreme Court of New Jersey explained, even though the prosecutor did make certain "improprieties" in his closing argument, Petitioner was not deprived of a fair trial.  Chew, 695 A.2d at 1329.  Moreover, the trial judge gave curative instructions at trial to explain to jurors how to weigh the evidence presented by the prosecution. Chew, 695 A.2d at 1330.  Thus, Petitioner's claim for habeas relief due to prosecutorial misconduct is denied.

**5.      Failure to Disclose Evidence in Discovery**

In Petitioner's final claim, Petitioner asserts that his due process rights were violated when

the trial court permitted the State's medical examiner to testify regarding the nature of the wounds on the victim's body even though the examiner's report that the prosecution gave to Petitioner did not contain such information.   On direct appeal, Petitioner argued that the testimony of the examiner prejudiced him during the guilt phase and penalty phase of the trial.   The Supreme Court of New Jersey found "no error in allowing the testimony" and that "the [trial] court properly instructed the jurors on their responsibility to exclude consideration of the manner of Ms. Bowman's death from their penalty-phase deliberations." Chew, 695 A.2d at 1331.   The court noted that, "shortly before trial," the prosecution informed Petitioner that the medical examiner would testify that the criss-crossed wounds on Ms. Bowman's body were made while she was either restrained or immobile and that such marks were made deliberately. Id.   Defense counsel objected to the admission of the testimony.   In response to this objection, the trial judge explained that the jury would see the wounds on Ms. Bowman's body in pictures and therefore to "omit" discussion of the wounds may confuse jurors. Id.   Additionally, the Supreme Court of New Jersey stated, in response to Petitioner's claim that he was prejudiced in the penalty phase, that the trial court properly instructed the jury to exclude the medical examiner's testimony regarding the manner of Ms. Bowman's murder in their penalty phase deliberations. Id.

In Petitioner's application for habeas relief, he asserts that the prosecution did not provide him with "material information" through discovery.   Petitioner cites Brady v. Maryland in support of his position. 373 U.S. 83 (1963).   Respondents, in their answer, contend that Petitioner has failed to state a federal constitutional issue, stating that Petitioner's arguments center on state discovery laws.   In the alternative, Respondents assert that Petitioner's claim is without merit, arguing that the Supreme Court of New Jersey properly found that Petitioner was on notice about the evidence given the

26

pictures taken by police of the victim.

Petitioner's final claim for habeas relief fails.  Although Petitioner's grounds for relief on this point were not clearly set forth, it appears that he cites <u>Brady</u> to show that the Supreme Court of New Jersey's decision was contrary to federal law.  28 U.S.C. 2254(d)(1).  The United States Supreme Court held in <u>Brady</u> "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady</u>, 373 U.S. at 87.  First, the prosecutor's failure to disclose the medical examiner's testimony was not a <u>Brady</u> violation.  <u>Brady</u> states that the suppression of evidence is a due process violation when the evidence is *exculpatory*. <u>Brady</u>, 373 U.S. at 87.  In the instant case, the medical examiner's testimony was not favorable to Petitioner.  Second, Petitioner was aware of the type of wounds on Ms. Bowman's face and neck from pictures taken of the victim after her death.  <u>Chew</u>, 695 A.2d at 1331.  Therefore, although the discussion of the wounds was not contained in the medical examiner's report, Petitioner could prepare his case accordingly.

Also, contrary to Petitioner's argument, he was not prejudiced in the penalty phase.  As the Supreme Court of New Jersey explained, the trial judge properly instructed the jurors to exclude the manner in which Ms. Bowman was killed from their considerations at the penalty phase.  The Supreme Court of New Jersey's ruling was not contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Petitioner's due process rights were not violated when the trial court admitted the medical examiner's testimony about the injuries to the victim.

**IV.**   **Conclusion**

In conclusion, for the reasons stated above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.  The Court further finds that no certificate of appealability will be issued because Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).  An appropriate order accompanies this opinion.

DATED:        August 21, 2007

s/ Jose L. Linares
JOSE L. LINARES, U.S.D.J.

28